UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOREX PETROLEUM LTD.,

         Plaintiff,

-v-

ACCESS INDUSTRIES, INC., et al.,

         Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 4 2007

No. 02 Civ. 1499 (LTS)(KNF)

**ORIGINAL**

OPINION AND ORDER

      This is a case involving alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961, et seq., and of Russian law. Plaintiff contends that Defendants orchestrated a massive racketeering and money laundering scheme, the principal aspect of which was to take control of a substantial portion of the Russian oil industry, including Plaintiff's business, in violation of RICO. Defendants move to dismiss the First Amended Complaint (the "Am. Compl." or "the Complaint") in two sets of motion practice: a joint motion to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), and motions by various subgroups of the Defendants to dismiss that Complaint on other grounds.

      This Opinion addresses the joint motion seeking dismissal of the Complaint for lack of subject matter jurisdiction. The Court has considered thoroughly all arguments and submissions in connection with the instant motion. For the following reasons, Defendants' motion to dismiss the Complaint for lack of subject matter jurisdiction is granted in all respects.

NOREXII.WPD    VERSION 9/24/07

Copies mailed on Courtweb picked up by counsel for TIs & As
Chambers of Judge Swain

BACKGROUND

Although the First Amended Complaint adds some new Defendants to this matter, the central factual allegations are the same as those in the original complaint and familiarity with the background of the facts in this matter, and its procedural posture, is presumed. See Norex Petroleum Ltd. v. Access Industries, Inc., 304 F. Supp. 2d 570 (S.D.N.Y. 2004), vacated and remanded by Norex Petroleum Ltd. v. Access Industries, Inc., 416 F.3d 146 (2d Cir. 2005). The following brief summary will suffice here for context. Plaintiff Norex Petroleum Limited ("Norex") is organized under the laws of Cyprus, maintains a representative office in Calgary, Canada, and is owned by Appalachia Investments, Ltd., which is organized under the laws of California. (Am. Compl. ¶ 14.) Norex's beneficial owner is Alex Rotzang ("Rotzang"), a Canadian citizen. Norex alleges that the Defendants[1] are participants in a widespread

---

[1] The Amended Complaint identifies eight groupings of defendants, defined as follows: (1) the Access/Renova Defendants (including Access Industries, Inc. ("Access"), Renova, Inc. ("Renova"), Leonid Blavatnik ("Blavatnik"), and Victor Vekselberg ("Vekselberg")); (2) the Alfa-Crown Defendants and Affiliates (including Alfa Group Consortium ("Alfa Group"), Crown Finance Foundation ("CFF"), CTF Holdings Ltd ("CTF Holdings"), Alfa Finance Holdings, SA ("Alfa Finance"), Crown Luxembourg Holdings, Sarl ("Crown Luxembourg"), German Khan ("Khan"), Alexey Kuzmitchev ("Kuzmitchev"), and Vladamir Plouzhnikov ("Plouzhnikov")); (3) the Trading Division Defendants (including Crown Commodities Ltd ("Crown Commodities"), Crown Trade and Finance Limited ("CTF Ltd"), Crown Resources A.G. ("Crown AG"), Crown Resources (USA) Inc. ("Crown Resources"), Elliot Spitz ("Spitz"), and OOO Alfa-Eco ("Alfa-Eco")); (4) the BP Defendants (including BP plc ("BP"), John Browne, Lord of Madingly ("Browne"), Robert Sheppard ("Sheppard"), Robert Dudley ("Dudley"), and TNK-BP Limited ("TNK-BP")); (5) the TNK Defendants and Affiliates (including OAO Tyumen Oil Company (TNK), TNK International Ltd. ("TNK Int'l"), Joseph Bakaleynik ("Bakaleynik"), Simon Kulkes ("Kulkes"), Igor Nam ("Nam"), Alexander Berman ("Berman"), OAO TNK-Nyagan ("TNK-NG"), and OAO TNK-Nizhnevartovsk ("TNK-NV")); (6) the "Slush Fund" Companies

racketeering and money laundering scheme (referred to by Norex as the "Illegal Scheme") whose principal purpose is to take over a substantial portion of the Russian oil industry through the use of Russian oil companies including Tyumen Oil Company ("TNK") and Yugraneft. (Id. ¶¶ 1, 4.) The Illegal Scheme also allegedly involved illegal participation by Americans who have been named as Defendants here in the Cuba "REZ" and Cuban "oil-for-sugar" programs and illegal participation by numerous Defendants in the Iraqi "oil-for-food" program. (Id. ¶¶ 212-226.)

Norex alleges that Defendants committed numerous offenses in the United States in furtherance of the Illegal Scheme that are acts of racketeering within the meaning of RICO, including mail and wire fraud, money laundering, Hobbs Act violations, Travel Act violations and bribery. (Id. ¶¶ 261-321.) In essence, Norex claims that, by means of this Illegal Scheme, it was deprived of its majority ownership stake in Yugraneft and of certain quantities of oil owed to it by Yugraneft and other Russian oil entities through a series of unlawful actions that included bribery of Russian governmental officials and corrupt Russian bankruptcy proceedings.

## DISCUSSION

I.   Motion to Dismiss Standard

Plaintiff, as the party asserting that the Court has subject matter jurisdiction, bears

---

(including LT Enterprises Limited ("LT"), Sandwell Enterprises Limited ("Sandwell"), and Eastmount Properties Limited ("Eastmount"), Star Port LLC ("Star Port"), Watford Ltd. ("Watford"), and Futura SA ("Futura")); (7) the "Front Companies" (including Aletar Company, Inc. ("Aletar"), Kelland, and Ozerla Business Corp. ("Ozerla")); and, finally, (8) the "Corporate Masterminds" or Astons Defendants (including Astons Trustees Limited ("Astons"), Gillian Caine ("Caine"), Susan Cubbon ("Cubbon"), Simon Elmont ("Elmont") and James Grassick ("Grassick")).

the burden of proving the Court's jurisdiction. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990). A court determining a motion to dismiss for lack of subject matter jurisdiction must "accept as true all material factual allegations in the complaint," Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (internal citation omitted), but refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]." Id.

II.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

   A.  *Plaintiff's Preliminary Arguments Concerning Jurisdiction*

   In seeking dismissal of the Complaint for lack of subject matter jurisdiction, Defendants argue that RICO does not apply to Plaintiff's claims because the principal actions and events underlying Plaintiff's claim occurred outside of the United States. Plaintiff first counters by arguing that the issue of the extraterritorial application of a federal statute implicates the failure to state a claim, rather than subject matter jurisdiction. Plaintiff cites the recent Supreme Court decision in Arbaugh v. Y& H Corp., 126 S. Ct. 1235 (2006). In Arbaugh, the Court noted:

> On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous. 'Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief – a merits – related determination.' . . . Judicial opinions, the Second Circuit incisively observed, 'often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim.'
> . . .
> In Arabian American Oil Co. [499 U.S. 244 (1991)], we affirmed the judgment of the courts below that Title VII, as then composed, did not apply to a suit by a United States employee working abroad for a United States employer. That judgment had been placed under a lack of subject-matter jurisdiction label. We agreed with the lower courts' view of the limited geographical reach of the statute. . . . En passant, we copied the petitioners' characterizations of terms included in

> Title VII's "Definitions" section, 42 U.S.C. § 2000e, as "jurisdictional." . . . But our decision did not turn on that characterization, and the parties did not cross swords over it. . . . In short, we were not prompted in Arabian American Oil Co. to home in on whether the dismissal had been properly based on the absence of subject-matter jurisdiction rather than on the plaintiff's failure to state a claim.

Id. at 1242-1243 (internal citations omitted).

Defendants, on the other hand, characterize Arbaugh, which held that Title VII's limited definition of covered "employer" implicated a merits, rather than a subject matter jurisdiction, issue, as a decision dealing with statutory construction, and assert that the opinion is thus inapplicable to the present matter.

The Second Circuit has not yet addressed the question of whether Arbaugh compels the treatment of issues relating to the extraterritorial reach of federal statutes as merits questions rather than ones going to subject matter jurisdiction. In a line of cases ending with North-South Fin. Corp. v. Al-Turki, 100 F.3d 1046 (2d Cir.1996), however, the Circuit characterized limits on RICO's extraterritorial application as constraints on district courts' subject-matter jurisdiction. This Court is "bound by the Court of Appeals' decisions until such time as they are directly overruled by that court or the Supreme Court." Ayyash v. Bank Al-Madina, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at n.2 (S.D.N.Y. Mar. 9, 2006). Accordingly, the Court will apply the North-South Finance approach in evaluating Defendants' arguments, treating the extraterritoriality issue as one that implicates subject matter jurisdiction.

Plaintiff next argues that, because almost all of the alleged predicate acts that form the pattern of racketeering activity upon which its RICO claim is premised were committed in the United States and the remaining predicate acts allegedly either were committed by Americans or were committed by non-Americans but had effects in the United States, the issue of

extraterritoriality is not even presented here and there is no factual basis for questioning the Court's subject matter jurisdiction of its RICO claims.

Plaintiff relies on Alfadda v. Fenn, 935 F.2d 475 (2d Cir. 1991), for support of its argument that it need only allege a pattern of racketeering activity in the United States in order to establish subject matter jurisdiction under RICO. This reliance is misplaced. As the Second Circuit remarked in North-South Finance, the Alfadda Court was "concerned primarily with subject matter jurisdiction over the plaintiffs' securities fraud claims under the conduct test . . . [and] [l]ittle additional analysis or discussion was needed to hold that subject matter jurisdiction existed over the RICO claims as well, since the securities fraud violations [that were central to the claimed injuries in that case] were predicate acts which occurred primarily in the United States." North-South Finance, 100 F.3d at 1052, n.7 (internal citations and quotation marks omitted). Indeed, the Second Circuit distinguished in North-South Finance between "conduct that is merely preparatory to the fraud," which would not support RICO subject matter jurisdiction under the conduct test, and "conduct that is both material to the completion of the fraud and the direct cause of the alleged injury," which would. Id. at 1053. Thus, allegations of predicate RICO acts occurring in the United States are not always sufficient to support the exercise of jurisdiction[2] and the Court will address the question of whether RICO was intended to reach the extraterritorial conduct that is at issue in this case.

---

[2] Cf. North-South Finance, 100 F.3d at 1053 (use of mail and wires in U.S. as part of alleged foreign fraud scheme insufficient to constitute conduct supporting exercise of subject matter jurisdiction in RICO case, citing Butte Mining PLC v. Smith, 76 F.3d 287, 291 (9th Cir. 1996)).

B.   *Extraterritorial Application of RICO*

The Second Circuit has held that RICO's extraterritorial application is limited. In North-South Finance, the Second Circuit acknowledged that it has left open the question of precisely what test(s) are to be applied in analyzing the existence of a basis for exercising subject matter jurisdiction in cases involving the extraterritorial application of RICO, a statute that is itself silent with respect to extraterritorial application, but observed that there are two tests that have been used: the "conduct" test and the "effects" test. See North-South Finance, 100 F.3d at 1051-1052.

The "conduct" test is a two-pronged inquiry: a plaintiff must show (1) that "conduct material to the completion of the fraud occurred in the United States," and that (2) the U.S. conduct was the "direct cause of the alleged injury." Id. at 1053 (citations omitted). Two versions of the "effects" test have been applied in RICO cases in this Circuit, one borrowed from securities law and one from antitrust law.[3] The securities law version confers jurisdiction "whenever a predominantly foreign transaction has substantial effects within the United States." Id. at 1051 (citation omitted). Under the antitrust version of the effects test, jurisdiction exists when extraterritorial conduct is intended to and actually does have a detrimental effect on United States imports or exports. See id. Both versions of the effects test are designed "to protect domestic investors and markets from corrupt foreign influences." Regardless of which test is applied, the ultimate inquiry is whether "Congress would have wished the precious resources of

---

[3]   In North-South Finance, the Second Circuit acknowledged that the application to RICO of these tests may be inappropriate, stating "[we] do not assume that congressional intent in enacting RICO justifies a similar approach to the statute's foreign application." 100 F.3d at 1052.

United States courts . . . to be devoted to [foreign transactions] rather than leave the problem to foreign countries." Id. at 1052.

District courts examining the extraterritorial application of RICO since North-South Finance have generally looked at the results of both the conduct and effects tests as relevant to the ultimate question of Congressional intent. Some courts have found jurisdiction based upon the clear satisfaction of one of the tests, see, e.g., Nat'l Group for Comm. and Computers v. Lucent Technologies, Inc., 420 F. Supp. 2d 253 (S.D.N.Y. 2006). Others have focused on the effects test, apparently influenced by North-South Finance's suggestion that the effects test might be a better fit, see, e.g., Alfadda v. Fenn, 966 F. Supp. 1317 (S.D.N.Y. 1997). At least one court has held expressly that subject matter jurisdiction is present where either test can be met. See Madanes v. Madanes, 981 F. Supp. 241, 250 n.6 (S.D.N.Y. 1997) (holding that "the most judicious approach is to permit RICO subject matter jurisdiction where either test is met, as other Circuits have done.") This Court need not determine how many of the tests must be met because, for the reasons that follow, none of the tests supports a finding of subject matter jurisdiction in this action.

1.  Conduct Test

As noted above, the conduct test is a two-pronged inquiry: a plaintiff must show (1) that conduct material to the completion of the fraud occurred in the United States; and (2) that the U.S. conduct was the direct cause of the alleged injury. Plaintiff proffers that the following allegations suffice to satisfy the conduct test: first, general allegations that U.S. defendants "masterminded, operated and directed" the illegal conduct; second, allegations that Defendants

used money transferred through U.S. wires to bribe Russian officials and commit various violations of U.S. laws and statutes; third, that Defendants traveled between the U.S. and Russia in aid of various aspects of the alleged Illegal Scheme; fourth, that an extortion attempt was made by Defendant Khan while Rotzang was in San Francisco;[4] and fifth, that the "final extortion" in Russia – namely the seizure of Yugraneft – violated the Hobbs Act.

Plaintiff cites the Second Circuit's holding in SEC v. Berger, 322 F.3d 187 (2d Cir. 2003), for support of its argument that the conduct test is satisfied where the alleged fraudulent scheme is masterminded and implemented in the United States. However, Berger also holds that:

> In considering the conduct test, we have held that jurisdiction exists only when 'substantial acts in furtherance of the fraud were committed within the United States,' . . . and that the test is met whenever (1) 'the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere' and (2) the 'activities or culpable failures to act within the United States directly caused the claimed losses.'

Id. at 193 (internal citations and some quotation marks omitted).

The Berger Court held that U.S. conduct such as the creation of false financial information, transmission of that false financial information overseas, and approval of the resulting false financial statements prior to transmission of the statements to investors was not "merely preparatory" to the fraud at issue in that case, which involved the falsification of information concerning the performance of an investment fund. In contrast, Plaintiff's conclusory allegation that Defendants "operated and directed the Illegal Scheme from this district," (Am. Compl. ¶ 2), is insufficient to support subject matter jurisdiction, particularly

---

[4]   See Am. Compl. ¶ 130; Mem. In Opp. at 16.

where Plaintiff's claimed injuries stem from the takeover, in Russia, of a Russian company. Plaintiff's specific allegations of U.S. conduct are few and far between; none is central to the consummation of the Russian oil company takeover and profit diversion that Norex identifies as the cause of its monetary damages. (See, e.g., Am. Compl. ¶¶ 11, 331.)  The conduct alleged to have taken place in the United States was preparatory or peripheral to the alleged scheme at best. Nor has Plaintiff made sufficient allegations that the U.S. conduct was the direct cause of the alleged injury.

Similarly, the allegations that Defendants wired, "through banks in the United States," money used to bribe Russian officials (see, e.g., Am. Compl. ¶¶ 288-289), as well as money to purchase interests in TNK and other assets, or that was derived from allegedly illegal activity (id. ¶291-296), and used money and communication wires to perpetuate money laundering and tax fraud (id. 297-302), do not support subject matter jurisdiction of the RICO claim asserted in this case.  Although courts have held the jurisdictional requirement satisfied where a wire transfer into or from the United States is integral to the fraud that is at the heart of a RICO claim (see Madanes, 981 F. Supp. at 251 (subject-matter jurisdiction found where wire transfers were integral to fraud because they served to hide assets from plaintiff), see also Bank of Crete, S.A. v. Koskotas, No. 88 Civ. 8412, 1991 WL 177287, at *6 (S.D.N.Y. Aug. 30, 1991) (jurisdiction found where defendant transferred funds from plaintiff's U.S. bank account to defendant's U.S. account for personal use)), the Second Circuit has held that the conduct test is not satisfied where the transfer of funds into or out of the United States is merely incidental, "preparatory," or "peripheral" to the principal fraud. See North-South Finance, 100 F.3d at 1053. Here, the principal conduct complained of is the theft of Plaintiff's interests in Russian oil

companies. The Complaint's allegations of use of wires clearly relate to alleged conduct that was only preparatory and peripheral to this fraud. None of these U.S. predicate acts, as described by Plaintiff in its Complaint and supplemental submissions, was material to the completion of the central fraud. See North-South Finance, 100 F.3d at 1503.

Plaintiff's allegation regarding the Defendants' travel between the United States and Russia is similarly insufficient to support a finding of subject matter jurisdiction. Plaintiff alleges that Defendants traveled "[i]n order to effect the Illegal Scheme." (Compl. ¶ 318.) However, this bald assertion neither ties the travel to the completion of the scheme nor satisfies the second prong of the conduct test, which requires that the U.S. conduct be the *direct cause* of the alleged injury.

Finally, Plaintiff alleges that Defendant Kahn's attempted extortion of Rotzang while Rotzang was in California violated the Hobbs Act, and that the "final extortion" in Russia – the seizure of Yugraneft – also violated the Hobbs Act, thus providing a basis for the exercise of RICO jurisdiction. The Hobbs Act provides in relevant part that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C.A. § 1951(a) (West 2006).

Plaintiff alleges that Defendant Khan told Rotzang that "if Yugraneft did not forget about the oil debt, 'TNK would run over Yugraneft like a steamroller' and 'we eliminate those who go against us.'" (Am. Comp. ¶ 131.) Even assuming that the activity complained of rose to the level of a Hobbs Act violation, which is questionable from the face of the Complaint,

Plaintiff again falls short on the second prong of the conduct test – the requirement that the U.S. conduct have been the direct cause of the alleged injury. Plaintiff acknowledges in the Complaint that Yugraneft continued its efforts to collect the oil debt after the alleged threat was made. (Id. ¶ 134.) Thus, it is unclear how Plaintiff can argue that the attempted extortion was the direct cause of its alleged injury. Similarly, even assuming there is relevant logic in Plaintiff's argument that other threats, allegedly made in Russia to a Russian company official, provide a U.S. connection because they violated the Hobbs Act, the Complaint alleges that the collection efforts continued even after these later threats and that the claim was settled unfavorably only after the complained-of takeover. (Compl. ¶ 129.)

In sum, the Plaintiff has failed to proffer facts sufficient to satisfy the conduct test, as it has failed to show that the conduct that was material to the completion of the Illegal Scheme occurred in the United States and that the conduct that occurred in the United States was the direct cause of the alleged injury.

2. Effects Test

As noted earlier, two versions of the effects test, one borrowed from securities law and one borrowed from antitrust law, are recognized in this Circuit. The securities law version finds jurisdiction whenever a predominantly foreign transaction has substantial effects within the United States and the antitrust law version is satisfied whenever extraterritorial conduct is intended to and actually does have a detrimental effect on United States imports or exports.

a. *The Securities Law Version of the Effects Test*

Plaintiff argues that its Complaint satisfies both versions of the effects test.

Regarding the securities law version, Norex argues that it is protected by an "equal access" treaty that requires it to be treated as the equivalent of an American citizen, and that therefore harm it has suffered is to be deemed harm to a U.S. citizen. Plaintiff does not supply case law in support of this argument, and it is unavailing. The notion that injury to any corporation whose home government has entered into an equal access treaty with the U.S. is to be treated as injury occurring within the United States for the purpose of authorizing the exercise of jurisdiction over extraterritorial conduct is inconsistent with this Court's duty to inquire as to whether "Congress would have wished the precious resources of United States courts . . . to be devoted to [foreign transactions] rather than leave the problem to foreign countries." North-South Finance, 100 F.3d at 1052. Furthermore, it appears that the purpose of so-called "equal access treaties" is simply to guarantee certain foreign plaintiffs equal access to American courts, rather than to expand the substantive reach of U.S. law. See Blanco v. Banco Industrial de Venezuela, S.A., 997 F.2d 974, 981 (2d Cir. 1993); see also Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, n.9 (S.D.N.Y. 2003).

       Plaintiff also argues that it satisfies the securities version of the effects test with its allegations that the execution of the Illegal Scheme caused harm to numerous U.S. investors and Defendants' U.S. competitors. The Complaint alleges that "numerous" U.S. interests were harmed, including but not limited to shareholders of BP, the Harvard University Endowment Fund (on the basis of that Fund's holdings in another entity that in turn held shares in an affiliate of Kondpetroleum and Chernogorneft), holders of American Depository Receipts of Genrogorneft, U.S. citizens who "on information and belief" were shareholders of TNK subsidiaries and, finally, the United States itself by virtue of Defendants' alleged illegal

involvement in various Cuban and Iraqi aid programs. In declarations submitted in connection with its opposition to this motion, Plaintiff makes additional proffers regarding harm to American investors, including that over 30 American individuals were harmed when the value of their American Depository Receipts for interests in Chernogorneft declined drastically (the capitalized value of the ADRs allegedly fell from $486 million to $12 million); that the European Bank for Reconstruction and Development, which Plaintiff characterizes as "largely financed by American taxpayers," was harmed as the largest creditor of Chernogorneft and had $22 million of exposure; and that a beneficial owner of Sidanco, Kantupan Holdings, represented various American investors and lost money due to the bankruptcies of Chernogorneft and Kondopetroleum.

Plaintiff's allegations of harm fail to meet the effects test. The Complaint makes only vague allegations of indirect harm accruing from, inter alia, harm to corporations in which U.S. entities may have at times invested, by means of suppressed competition, diverted profits or the takeover of affiliates, and failure of U.S. citizens to pay taxes on income arising from transactions among entities used to pay bribes to foreign officials. Furthermore, while the Court recognizes that Plaintiff has an American parent corporation, Plaintiff's submissions identify its beneficial owner, Alex Rotzang, as Canadian. See Opposition Papers 2 and Declaration of Philip Murray ¶ 8.

The additional factual proffers that Plaintiff makes in its declarations submitted in opposition to this motion also fail to satisfy the effects test. Various courts applying the securities version of the effects test in this Circuit have clarified the contours of the test, and have repeatedly concluded that the test is not met where the plaintiff is not alleging any harm in

America to the plaintiff itself, but is instead alleging harm to others. For example, in In re Yukos Oil Company Securities Litigation, which also dealt with a Russian oil company, the court approached the question of whether or not the effects test was satisfied by the various plaintiffs in that case on a plaintiff by plaintiff basis, finding as to some plaintiffs that, because there was no contention that the specific plaintiff itself "suffered any effects in the United States attributable to Defendants' alleged securities fraud," the court lacked subject matter jurisdiction of that specific plaintiff's claims. In re Yukos Oil Company Securities Litigation, No. 04 Civ. 5243(WHP), 2006 WL 3026024, at *11 (S.D.N.Y. Oct. 25, 2006).

Likewise, in Interbrew v. Edperbrascan Corp., 23 F. Supp. 2d 425 (S.D.N.Y. 1998), the court found that the effects test was not satisfied where the plaintiff Belgian organization sued a Canadian defendant for losses allegedly sustained in connection with the purchase of a Canadian corporation whose stock was traded on a Canadian stock exchange, and where Plaintiff had alleged no effect on a U.S.-affiliated company. The Interbrew court noted that U.S. investors had made up approximately 25% of the investors in the acquired Canadian corporation, but that those investors were neither the intended nor the actual "victims" of Defendant's purported scheme to defraud, such that any harm they suffered was insufficient to support jurisdiction under the effects test. Id. at 430.

> The only justification for considering their participation as a basis for the exercise of jurisdiction would be to use the securities laws to 'insure the maintenance of fair and honest markets' as [Plaintiff] urges. The anti-fraud provisions of the U.S. securities laws would then be used to address general market conditions rather than redress specific harms suffered by some U.S.-interested party, a goal specifically foreclosed by numerous interpretations of the securities laws.

Id. (emphasis added). As the Interbrew Court concluded, "[t]o the extent that [Defendant]'s allegedly misleading statements caused specific harmful effects, those effects were felt by

[Plaintiff], a Belgian organization, and its investors (none of whom are alleged to be Americans)." Id.

These cases and the instant matter are thus different from cases such as Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968), where the Second Circuit found the effects test met when the plaintiff himself was an American shareholder of a Canadian corporation the shares of which traded on both the American Stock Exchange and the Toronto Stock Exchange, and where the alleged damages resulted from sales made in Canada to the wholly-owned subsidiary of a French corporation and to an American corporation. Id. at 204. This matter is also distinguishable from Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252 (2d Cir. 1989), where the Second Circuit, citing Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975), found that the test was met when American residents representing 2.5% of Gold Fields' shareholders owned 5.3 million shares with a market value of about $120 million. In Consolidated Gold Fields, unlike the present action, the Plaintiffs (target and target-controlled entities of a hostile takeover) themselves had American beneficial owners (approximately 50,000 shares held directly by Americans).

Finally, the present action is also distinguishable from Itoba Limited v. LEP Group PLC, 54 F.3d 118 (2d Cir. 1995), where the Second Circuit found the test met when the plaintiff, a wholly-owned subsidiary of the transnational company ADT, sued a British issuer and its United States-based officers, alleging failure to disclose in SEC filings certain high risk investments and speculative business ventures undertaken by the corporation. Id. at 118-21. The Second Circuit found that the "fraud occurring on an American exchange and persisting abroad . . . impacted detrimentally upon thousands of United States shareholders in the defrauded

company, i.e., over $100 million lost in the shareholders' corporate equity." Id. at 124. Specifically, the Court relied on the fact that approximately fifty percent of ADT's shares were held in the United States. Id. The Second Circuit in Itoba focused on the fact that, there, it was the American shareholders of the parent company who financed the deal and "ultimately must bear the loss." Id. at 124. While the Plaintiff here, as in Itoba, is a wholly owned subsidiary of an American corporation, Norex admits that its beneficial owner is a Canadian citizen. Norex's losses ultimately harm its Canadian beneficial owner.

Accordingly, Norex's allegations, both in the Complaint and in the declarations submitted in connection with briefing on the present motion, fail to satisfy the securities version of the effects test.

b.   *The Antitrust Version of the Effects Test*

With respect to the antitrust version of the effects test, Plaintiff, citing North-South Finance and Wiwa v. Royal Dutch Petroleum Co., 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002), argues that RICO can be applied to extraterritorial conduct if the foreign conduct has an effect on United States imports or exports. As previously noted, the Second Circuit's opinion in North-South Finance did not review the application of the effects test to the conduct at issue in that case. North-South Finance is, nonetheless, the appropriate starting point for the analysis, as it is the Second Circuit's most recent discussion of the antitrust effects test standard in the RICO context. Its iteration of the effects test is different from that proffered by Plaintiffs here – according to the North-South Finance Court, a U.S. effect is not enough. Rather, North-South Finance recognized the established principle that "antitrust liability may

attach to anticompetitive conduct occurring outside the United States, but having consequences here, if the conduct is intended to and actually does have an effect on United States imports or exports which the state reprehends." North-South Finance, 100 F.3d at 1052 (emphasis supplied). In United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945), which the North-South Finance Court cites for this principle, the Second Circuit found the antitrust laws applicable to a quota scheme restricting aluminum imports into the United States. Id. at 444. Hartford Fire Ins. Co. V. California, 509 U.S. 764, 796 (1993), also cited by the North-South Finance Court, held that the antitrust laws reached conspiracies by London insurers to "affect the market for insurance in the United States" which "conduct in fact produced substantial effect."

Here, neither Plaintiff's allegations in its Complaint nor its factual proffers in opposition to the instant motion demonstrate the requisite intent or the requisite effect on United States exports or imports. With respect to the intent of the alleged RICO scheme, the Amended Complaint makes it quite clear that the goal of the Illegal Scheme was to "take over a substantial part of the Russian oil industry." (Compl. ¶ 1 (emphasis supplied).) The detailed and extensive allegations of the Complaint make clear the Russian focus of the goal of the alleged scheme. Nor is there any proffer of effects that could reasonably be construed as having a detrimental impact on U.S. import or export markets. Norex cites a ripple effect of its cash flow problems resulting from inability to receive Yugraneft dividends to which it would have been entitled absent the takeover of that company, proffering an affidavit asserting that it had to terminate approximately $10 million of business with U.S. service providers. This hardly depicts an effect of any degree of significance for U.S. commerce.[5] The other effects relied upon by Norex in opposing this

---

[5] Cf. Aluminum Co. of America, 148 F.2d at 443 ("There may be agreements made beyond our borders not intended to affect imports, which do affect them, or which

aspect of the motion consist principally of allegations of losses by shareholders, some of them American, in entities that had invested in companies that had in turn invested in the Russian companies that were allegedly taken over illegally; evidence that some U.S. and international oil companies' portfolios include investments in Russian oil interests; and allegations of unspecified unfair competitive advantage within the Russian and worldwide oil markets. Plaintiff has failed to proffer allegations of intent or of effects on American commerce sufficient to demonstrate the propriety of exercise of subject matter jurisdiction under the effects prong of the antitrust test.[6]

Plaintiff's inability to meet any of the three tests recognized in this Circuit to support the extraterritorial application of RICO demonstrates that this is not the type of matter to which Congress intended federal courts to devote their resources. Accordingly, this Court lacks subject matter jurisdiction of Plaintiff's RICO claims. There being no other basis for the exercise of federal jurisdiction, the Court also declines to exercise supplemental jurisdiction of the Plaintiff's claims asserted under Russian law.

---

affect exports. Almost any limitation of the supply of goods in Europe, for example, or in South America, may have repercussions in the United States if there is trade between the two. Yet when one considers the international complications likely to arise from an effort in this country to treat such agreements as unlawful, it is safe to assume that Congress certainly did not intend the [Sherman] Act to cover them.").

[6] Wiwa v. Royal Dutch Petroleum Co., 96 Civ. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002), the unpublished district court decision on which Norex also relies in this connection, does not persuade this Court that a different result is appropriate. In Wiwa, which involved claims under the Alien Tort Claims Act, RICO and a variety of other laws arising from violence in connection with alleged private and Nigerian government collaboration in the forcible takeover of an area in which 90% of Nigeria's oil was produced, there were allegations that 40% of Nigeria's oil was exported to the United States *and* that the scheme in question was intended to enable the defendants to "'gain significant competitive advantage' in the United States." Id., 2002 WL 319887 at *22. No such allegations of intent or commercial impact are presented here.

Having reviewed thoroughly the Complaint and all of the Plaintiff's additional declarations and proffers submitted in connection with its opposition papers, the Court finds that Plaintiff has failed to sustain its burden of demonstrating the existence of subject matter jurisdiction and that granting leave to file a further amended complaint would be futile. Accordingly, the Complaint will be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants' joint motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) (docket entry 197) is granted and Plaintiff is denied leave to file a further amended complaint. This decision moots, and thus terminates, all other pending motions and applications in this case (see docket entries 204, 206, 208, 211, 212, 214, 231, 242, 264, 266, 279, 288, 311). The Clerk of Court is respectfully requested to enter judgment dismissing the Complaint for lack of subject matter jurisdiction and to close this case.

Dated: New York, New York
September 24, 2007

LAURA TAYLOR SWAIN
United States District Judge